Our next case on calendar is United States v. Grant, 22-30071. Each side will have 15 minutes in this case. Good morning, Your Honors. May it please the Court, Jay Nelson on behalf of Tristan Grant. I'll do my best to watch my own clock and I'll try to reserve about three minutes for rebuttal if I can. We obviously received an order regarding Duarte as well. And I think because that issue hasn't been briefed, I think it might make sense to start there. And after that, I'd like to use some time to discuss our jury waiver issue. And if there happens to be any time after that, maybe the prejudgment issue, if that's okay with the Court. So starting with Bruin and Duarte, in our case, I think actually it's relatively straightforward in my opinion. One is I have to concede I made a mistake about the standard of review because under Duarte it's not really plain error for us. It should be de novo review. And then we turn after that to the two-step Bruin test. And under Step 1, we satisfy Step 1. And Duarte itself was silent on who bears the burden under Step 1, Bruin Step 1. But regardless, the record satisfies Step 1. Mr. Grant was convicted of simple possession of a handgun just like Mr. Duarte. And he is also an American citizen just like Mr. Duarte. And the PSR is not in the appellate record, but it's obviously in the district court record. It's document 278, page 3 identifies Mr. Grant as an American citizen. So we move past Step 1. At Step 2, I think it's actually relatively straightforward as well. Step 2 is clear. It's the government's burden to establish a historical analog to Mr. Grant's prior felony convictions. The record in our case is completely devoid of any evidence whatsoever regarding Mr. Grant's historical analogs. And the government had that burden when it filed its answering brief, and the government has met that burden. And so our position is that under Duarte, straightforward application, including the presumption, the government's burden at Step 2, there's really no basis not to grant relief under Duarte as far as Mr. Grant is concerned. But his predicates included attempted robbery in Virginia, third-degree assault in Alaska, and then there's also a possession with intent to distribute, which I have a separate question about. But starting with those two, is there really any doubt that those weren't like violent offenses that would be felonies at the founding, like within the Duarte framework? Absolutely. So the designation felony and the designation violent in and of themselves don't necessarily get the government home. And I would refer the court on that point to, I think it's footnote 15 of Duarte, where Duarte itself went through a number of crimes that would sort of, in sort of a casual sense, feel like maybe these are violent, dangerous crimes and it would make sense for them to be treated as disqualifying for disarmament. However, robbery is listed in footnote 15, and the Duarte court identifies an instance in the founding era when robbery was not treated. Let's focus on assault then. Do you have an argument? I guess it depends on what Mr. Grant was convicted of was assault three in Alaska. And so I think the analysis has to be, well, what does that mean? What are the elements of that offense? What's a historical analog? And would it have been treated either as a capital crime, as something worthy of estate forfeiture, or something worthy of life imprisonment? And that's the government's burden to prove to this court that that would have been true in the founding era. And is that determined – I mean this is the same question I asked in the prior case. Is it your view that that's determined by looking for whether there's a categorical match between the offense of conviction and some offense that existed at the founding? Or do we look at what he actually did and how that would have been treated at the founding? That's a great question. Thank you. I think the best evidence we have is what Duarte did. And if you look – I'm going to pull it up. I have it in front of me. At – Westlaw makes it head note 26. It's at the end of – it's really at the end of the opinion. And what Duarte does is it goes through the convictions themselves. Because what – 922G1 is it's not like a, hey, you're a dangerous person. We're going to take your gun away. It's you have committed a particular felony offense and we're going to take your gun away. So that's what Duarte did. So Duarte went through and it said here's – his vandalism conviction would have made him a misdemeanor at the founding. His second predicate, felon in possession, didn't even exist back then. And then his remaining convictions, drug possession, evading a police officer, we don't know whether they trace back to a founding era predecessor because the government failed to proffer that evidence. And I would actually argue that that's the case for every single one of Mr. Grant's prior felonies because that's the state of the record in our case right now. There's no evidence whatsoever about assault – what Alaska Assault 3 would have done to Mr. Grant at the founding era or attempted robbery, which is also, Your Honor, distinct from robbery. Attempted robbery is not even a completed robbery. When should the government have put in that evidence? I'm sorry, Your Honor. When should the government have put in that evidence in your view? When it responded in its answering brief before this court. Even though you didn't really make an argument? You just said we'd like to rely on other cases. I didn't have the burden. That was the government's burden. And Duarte was – Duarte – that was the Bruin analysis in effect at that time, putting the burden on the government. That was the analysis that the parties in Duarte went through. And I don't actually – I can't say for certain what exactly the procedural history on appeal was in Duarte, but that's what the briefing was in Duarte. And so I think the government was on ample notice that it carried the burden to establish a historical analog. There was no real ambiguity about that. But at the time they filed their brief, we had circuit precedent in Vongshue that said 922 is constitutional across the board. So is it your view that they should have anticipated that maybe a three-judge panel of this court would overrule Vongshue? And they would then suddenly need to put in evidence under some different rule? Absolutely. The government itself cited Duarte in its statement of related cases, as did we. Everyone was on notice in this case that Duarte was happening. Duarte was argued in December. What kind of evidence would you have liked the government to put in in its brief? The same kind of evidence that's being argued in every Bruin case around the country right now. And the government could have just come up with this on its own, and you would have had no objection to this? I would have had an opportunity to rebut it in my reply brief. There had been no findings by the district court. What we submitted, the PSRs, anything that had been produced if they were federal crimes? Like I said, I'm not exactly sure what happened in Duarte, but that's basically what happened in Duarte. It wasn't litigated at all in the district court. And then it was simply an appellate claim for relief that this court reviewed de novo and that panel reviewed de novo. So, yeah, my understanding of Duarte is that that's what happened. It was just litigated on appeal, and then Duarte ruled in favor of the defendant. And so, yes, the government – and it's not like by this point in history after Bruin that these arguments are necessarily novel. We're getting to that point on individual prior predicates, Assault 3 in Alaska, attempted robbery in Virginia. Maybe we are going to end up at a modified categorical analysis for the Second Amendment as well, Your Honor. That's what Duarte feels like to me, if I'm going to be honest. Like we're looking at this predicate, and then we have to find a way to decide whether or not this particular criminal offense would have resulted in permanent disarmament. I agree with my colleague Ms. Sun that we're talking about permanent disarmament. And what Duarte says about permanent disarmament is typically we find that because it would have either been a capital offense, an offense that gets you life in prison, or it gets you the forfeiture of your estate, which I guess is because then you lose your gun. If you lose all your stuff, you also lose your gun, I guess is what that means. So would these prior offenses have qualified Mr. Grant for that? We don't know. That was his job. What about the possession with intent to distribute predicate? And I grant you that when you read the Duarte historical discussion, it sounds like that shouldn't qualify. But I have a slip opinion. On page 60, the Duarte court says that we can use some historical regulations as analogies to modern crimes that share with them enough relevant similarities to justify permanent disarmament. And then they have this citation to Alanis with a parenthetical. Like burglary or robbery, modern day drug trafficking plainly poses substantial risks of confrontation that can lead to immediate violence. So the Duarte court, and again, I don't know how you reconcile this with the historical analysis, but they seem to have thought that drug trafficking offenses do count as predicates. So what's your response to that? I'm not sure I would agree that Duarte went that far. I think, I mean essentially that sounds like dicta to me. And it wasn't a matter that was squarely before the Duarte court. I also think that unless that particular issue is litigated on its own merits with historical evidence provided by the government to meet its burden, we don't really know. And would it have resulted, even if it would have resulted in temporary disarmament, would it have resulted in permanent disarmament? Whatever the historical analog, because Duarte also discusses how most of what we consider controlled substances and illegal drugs now weren't really for the majority of American history. That was actually a fairly recent thing. So would… Well, many of them didn't exist for most of American history, right? So nobody could have passed a law against them, right? I'm not sure. Whatever the intoxicating things were then, you know, presumably alcohol, I'm not really sure what they were then. But that's, again, that's not my burden. That's the government's burden to show that intoxicating substances would have resulted in permanent disarmament. I don't know. We don't know. And that alone means that Mr. Grant gets relief on his firearm convictions before this court, in my opinion. Could I just briefly make a few comments about the jury trial waiver issue, Your Honors? So on the jury trial waiver, I think the critical fact is that Mr. Grant was unaware of the evolution of the district's general orders, which ultimately, as of October 2020, permitted an exception to the prohibition on criminal jury trials. And when he didn't know… As I read the general order, it only makes an exception for cases where there was a jury trial scheduled with a date. And I don't think he ever had a jury trial scheduled with a date at a time when that exception existed. So I don't understand how this exception applies to him. Well, he had a jury trial scheduled, and it got taken off because of the pandemic. But by the time the exception gets put into the general orders that say, like, you know, jury trials scheduled to occur before January 4, 2021, at the time that those exceptions had the wording, all of them said, you know, if there is a jury trial scheduled at a particular date, you can maybe get an exception. By the time that exception existed, he didn't have a jury trial date. Well, nobody really did by then because the general orders until then had eliminated – had taken all jury trials off the calendar. So, I mean, Mr. Grant had a jury trial, and it was removed by the district courts. It was a docket text order. I can't remember the exact date. So I'm not sure that's true for Eklund, though, the one that you point to as the jury trial that happened. My understanding was that it did have a jury trial date because it was going to be past the general order. Then the general order comes and says if you had one, you know, scheduled to start on a particular date, you can get an exception. And that one did get an exception, but it's because it had a date. That's my understanding. Maybe I'm wrong. I mean, I'm just not – looking at the language of this, I pulled it up, Your Honor. I'm not sure of any reason why Mr. Grant couldn't have gone to Judge Beislein and said, may I please have an exception to the prohibition on jury trials? It seems to be – so if you look at first the first – I mean, it was continuing all jury trials. All jury trials are continued, and that just kept happening month after month after month after month after month. And then there was an exception for ones that had already gotten a jury trial date. And he did have one, and it got removed because of the pandemic. So – and then it was just endlessly continued or just – I guess stay is one way to think about it. So I'm not sure why that would put him in a weird kind of vortex of just never being able to have a jury trial, even though he was one of the earlier cases who had a jury trial set. That seems like – if that's a requirement to avail yourself of the exception, I think that would be incredibly unfair to people like Mr. Grant and not really in the spirit of creating an exception that would – What's really challenging is the idea that COVID was a reason to delay jury trials. If that's – I don't think – I mean, our court has dealt with that, and that's not really your claim. So I think we have to assume that it was okay to delay jury trials, don't we? Well, as a matter of speedy trial litigation, that has been resolved by this court. But the question of whether he made a knowing and intelligent choice to waive jury trial in favor of a bench trial when he didn't actually understand the full contour of the jury trial right, which had been revived a little bit insofar as there was now an exception that would have allowed him to avail himself. Was this general order public? Yes. And he had counsel who could read it? Correct. And so why do we assume he didn't know about it? Well, nothing on the record indicates that whatsoever. And so nothing in the – everything in the record indicates that he was told over and over and over again, there's no jury trials, no jury trials, no jury trials, no jury trials, period.  So that's all we have to go on. If all of this means that there's only this very narrow exception for very narrow group of trials that he didn't apply to, would there be any problem? I'm sorry. If we read it – I mean it seems like you might read it differently, but if we read this exception as only applying to a very narrow category that he wasn't part of, then doesn't that put him back in the general idea that jury trials can be delayed, and you can't really make an objection to that? Probably. However, I mean I think that that would really not be in the spirit of what the district was trying to accomplish with creating the exception because that would put people like Mr. Grant, who had the oldest cases, who had no – who had been – who had their jury trials vacated, just sitting in limbo without any ability to avail themselves of this exception. And I'm not sure that that would be consistent with what Judge Burgess was trying to achieve with this general order. I'm not sure what the principle basis for excluding people like Mr. Grant would have been. So maybe the government hasn't answered that. I'm not really sure what it would be. Your Honors, may I reserve a little bit of time for rebuttal? Yes. Thank you. May it please the Court. Seth Bricky on behalf of the Appellee of the United States of America. Your Honors, I'll begin where my friend did, starting with the Duarte issue. Now, the government did not cite two particular historical analogs to Mr. Grant's underlying conviction in its answering brief because at the time the government was relying on Vong Tse as the controlling precedent in this circuit. Of course, Duarte has found that Vong Tse is abrogated under Bruin, and so we are prepared today to provide the Court with historical analogs to Mr. Grant's underlying convictions. And which convictions do you think are qualifying? I think the most readily available analogy is for robbery and attempted robbery. I think that the Crimes Act of 1790 passed by the first Congress of the United States, which is significant because that's the same Congress that passed the Second Amendment for ratification by the states, punished robbery on the high seas, an area of exclusive federal jurisdiction, with death. In other words, forfeiture of all political rights, including the right to life. Yeah, but that was an enumerated crime. That was in the Constitution. That was well established and one of the few things that Congress was told it could do. The remainder of robbery crimes were all punished by the states. And I think there's evidence that the states similarly punished robbery as a felony punishable by death. For instance, the laws of Massachusetts provided robbery was punishable by death until 1839, when the punishment of death was changed to imprisonment for life. Pennsylvania provided robbery was punishable by death from 1718 to 1790, but eventually in April of 1790, an act removed the penalty of death, but maintained that forfeiture of one's estate is still a punishment. That kind of progression of law is documented in Wharton's Treatise on Criminal Law of the United States, the 1846 edition on robbery. And what about—his offense was attempted robbery. Does that make a difference, do you think? Your Honor, I think there's two also close analogies to attempted robbery. Again, with the Crimes Act of 1790, it wasn't just those who commit robbery on the high seas that Congress punished by death, but also those who were accessories before the fact. Those who counseled, conspired, aided robberies on the high seas. So taking that zone of culpability, not just from the principal robber, those who complete the crime of robbery, but also those who take steps in furtherance of the robbery early on, I think that reflects an analogy here that's perhaps not a dead ringer, but very close. One thing about the robbery on the high seas, of course, this is piracy, which is the constitutional term. And robbers or pirates on the high seas oftentimes were not U.S. citizens and might not have been entitled to the Second Amendment protections. That's the whole problem with piracy is that they are outlaws. They are folks outside the law, whereas the state analogs would have been much more likely to have applied to people within the community. Your Honor, I think the statute does make a distinction between piracy and robbery. It uses the word piracy separately. You mean the statute does, but not the Constitution? The statute does, but not the Constitution. So I would argue that Congress, by creating piracy and robbery, using them in the same statute. And the distinction between piracy on the high seas and robbery on the high seas is what? Piracy on the high sea, well, piracy as defined in that Crimes Act, I believe, was larceny of a vessel. And they also included several different means through which someone could be considered a pirate, including inciting mutiny or to forcibly prevent an owner of a boat from protecting their goods on the high seas. But again, looking to the state statutes at the time, I do think that that reflects a general consensus that robbery was punishable by death. Furthermore, death was not just a theoretical penalty for robbery. Professor Arthur P. Scott of the University of Chicago published a book called Criminal Law in Colonial Virginia in 1930. And observed that there were four robbery trials reported in Virginia from 1752 to 1773, three of which resulted in convictions and death sentences. So this wasn't just a theoretical application of English common law punishments for robbery. This was, in fact, carried over into the colonies into the founding era. And again, looking at the attempt, I don't think the attempt makes a difference here. And I do think that because we're talking about trying to find a relevant analogy for the defendant, the particular circumstances of the defendant in this case, I do think looking at the offense conduct is appropriate. And that offense conduct is included in the pre-sentence report at the district court, where the underlying felony from Virginia resulted because of the defendant, along with another individual, approaching a group of minors with handguns drawn, demanding that minors empty their pockets. And the only reason that robbery wasn't completed was because the victims ran away and did not comply. Well, now, one of the reasons that we ended up with the categorical approach in ACCA is the concern that if you're looking at offense conduct, it raises the question of who has to find that. And do you think it's a problem for us to be making determinations about what his prior offense conduct was when that, whether he's guilty of whether he can constitutionally be punished for this offense, turns on what the prior conduct was. Doesn't that suggest that that has to be a fact that's charged in the indictment and found by a jury beyond reasonable doubt? Not something that we decide for ourselves looking at a PSR? I don't think so, Your Honor. And I think because the standard is not a categorical match, it's not a historical twin, but rather we're looking at historical analogies, which necessarily require looking at not the label or the strict elements of the offense as defined by modern statutes and comparing them to historical statutes, but also looking to the underlying conduct to inform how someone in the defendant's position would have been punished had he been in the founding era. But categorically or based on the particular facts? Based on the particular facts. And how do we know that? Again, the PSR. I don't know, but what in Duarte tells us that we look at the particular facts rather than the category? Your Honor, I think we look at the standard, which is not requiring a historical twin, but looking for an analog. I think use of the word analog itself requires some sort of comparison beyond the elements of the crime, trying to create a one-for-one match. But that might just be categorically not a one. I mean, it might just be an approximate one-to-one, categorically approximate rather than categorically exact. It doesn't mean we necessarily look at whether there were five kids who had change in their pockets or four or three. I mean, we're not looking at the particular facts necessarily. Your Honor, that may be true, and I apologize if I overstepped. I do think that looking at the charged conduct can help the court to determine what the appropriate analogy is, however. And what about the possession with intent to distribute predicate? That was a federal conviction. That was a federal conviction. And do you think that is a qualifying predicate? I do. I think for two reasons. First of all, the analogizing possession with intent to distribute, first of all, I think is a specifically modern, addresses a particularly modern program. The international drug trade, drug trafficking, doesn't appear to have been a societal issue in the founding era that I could discern. So I think it should be treated as a particularly modern problem, which under Duarte requires a relevantly similar comparisons. Here, I think the relevantly similar comparisons are robbery and burglary, as this court suggested in Alanis, where those crimes involved a particular degree of danger to the community, just as drug trafficking does today. What kind of drugs was he charged with attempt to distribute? Your Honor, I don't have that information. Would it make a difference? I don't think it would, Your Honor. Well, if it was fentanyl, that's obviously a modern drug. If it was cocaine, what would happen if we found that not only was it not prohibited, but that cocaine was used in the early part of the history of the country? I think the problem still persists that cocaine at that time wasn't a societal problem, wasn't a societal problem considered by the legislatures at that time. It was at many uses, including it was treated as medicinal and could be prescribed by physicians. So the fact that history has evolved and we've come to this place where these drugs are now presenting a new societal problem that Congress had to address, I think the court can take that into consideration. It sounds like the argument made by the dissenters in Bruin. No, Your Honor, I don't think it's the same argument made by the dissenters. I think it's reflective of the holding in Bruin, which only requires a relevantly similar analog for modern crimes that were unconceivable at the time of the founding. Your Honor, if I can turn now to the jury trial waiver issue. Mr. Grant knowingly, voluntarily, and intelligently waived his right to jury trial and was fully advised by the court of what that right consisted of. The record here shows that in December 2020, January 2021, February 2021, and March 2021, the four months leading up to trial, the district court met with Mr. Grant, addressed him directly in open court, and advised him of his right to a jury trial, what that right consisted of. In fact, though the court, under this court's precedent in Cochran, was entitled to rely on the written and signed waiver as presumptive, as being voluntary, knowing, and intelligent, and though the court was also well aware that Mr. Grant was represented by counsel throughout this process, multiple attorneys in fact, some of whom, at least one of whom during a representation hearing, made the record that, I've advised Mr. Grant that I do not think a bench trial is in his best interest. Nevertheless, despite that record, and despite the explanations given by the district court, who went above and beyond to assure the voluntariness of Mr. Grant's waiver, Mr. Grant was consistently and abundantly clear that he wanted to go to trial as soon as possible in that minute bench trial. This court shouldn't impose an additional requirement on district courts that it needed to advise Mr. Grant as to when jury trials would resume exactly. This was COVID, it was an evolving situation week to week and day to day. The district court was not in a position to precisely advise Mr. Grant when jury trials would be resuming. The district court did the best it could in this circumstance by advising Mr. Grant, jury trials may be beginning soon. I want to let you know that jury trials may be beginning soon. Knowing that, do you want to proceed? I think one particular part of the record is instructive on this point, and that's at ER 129 to 130. That is the December 2020 status conference. At that point, Mr. Grant was set to go to trial in February, and the prosecutor, when the court was discussing potentially scheduling a bench trial for that date, advised the court, and Mr. Grant was present for this discussion, saying that date comes approximately one week before the expiration of the current, then enforced, MGO, continuing all jury trials. And the prosecutor wanted Mr. Grant to be advised of that fact, that jury trials could theoretically begin one week after he had done his scheduled bench trial. Mr. Grant's statement, again, was unequivocal, saying regardless of when jury trials start, I want a bench trial. I want to go to trial. So Mr. Grant was aware of the consequences of his waiver, was aware that jury trials could presumably begin soon, yet decided, because of his desire to resolve his case quickly, that he wanted to pursue a bench trial as a sooner remedy. Your Honors, unless you have any further questions on that point. Could each of the MGOs has a date, everything suspended by January 4th. Could Grant have said, why don't you schedule my jury trial for January 5th? And then when the next round of orders came through, he would have been eligible for the exception. I think that was an option that may have been available to Mr. Grant. Why wasn't it explained to him? I don't think it was the district court's responsibility to explain that strategy to him. I think that would have been incumbent on his defense counsel, and I don't know whether that was explained or whether that was a strategy discussed with his defense counsel. So as I read the exception, it only applied to people who had a jury trial scheduled. Like, so it says all criminal trials scheduled to occur before January 4th, 2021, are continued. And then it has the exception, and the exception talks about all criminal trials scheduled to occur. As I understand it, when that language went into account, it went into effect, he did not have a jury trial scheduled at that point. So he wasn't under the exception as I read it. But I also don't read you as making that argument in your brief. I'm not making that argument, Your Honor, no. And so do you think I'm wrong in reading it that way, or you just didn't notice this problem? I didn't read the MGO that way, Your Honor. I had read the exception more broadly to apply that district courts had broad discretion to make exceptions as justice required in any particular case. Looking, though, at what actually happened historically in this district, I don't think any trials happened, right? So I'm not sure what – I mean, do you think I need to take your broader reading? I don't read it that way, so now what do I do? No, I don't think you need to take my broader reading. I think that that is an appropriate reading. At the time when this was going on, I didn't take that reading. I perhaps misread the MGO, so that's on me. Your Honors, unless there's further questions, I would also ask the Court to affirm the district court's judgment on the prejudgment issue, as there's no evidence in this record to suggest that the judge's mind was irrevocably closed on the issue of Grant's guilt prior to the close of trial, as well as the Speedy Trial Act issue. Thank you, Your Honors. Thank you. We have some time for rebuttal. Let's put two minutes on the clock, please. Thanks for the extra time. Regarding Duarte, to the extent we can object in an appellate court, I object to the government trying to come in here and orally present historical analogs. They have an opportunity to file an answering brief. They had an opportunity to file a 28-J letter after Duarte issued or after the court asked us to be able to prepare to address Duarte. I can't address that on the fly, other than actually fairly strongly by referring the court back to footnote 15, which lists Connecticut, Pennsylvania, South Carolina, Maryland, New York laws, which doesn't seem like on my reading of this footnote would have resulted in permanent disarmament for even a completed robbery, let alone an attempted robbery or other felonies at all. With regard to the jury trial waiver, I would also lodge another objection. Under the principle of party representation, Senator Nick Smith, I think that the parties came into this oral argument with the same interpretation of the general order, which was that anybody could raise their hand and ask for an exception. And even Judge Bybee, even if it was through a procedure such as the one you just suggested, by setting a jury trial, by telling the person, hey, you could get a jury trial exception if you set one and then ask for an exception. None of this stuff was really explained to Mr. Grant, who can't be, I think, as a lay person and a criminal defendant, couldn't be expected to come up with this stuff on his own. And as a. Could I just ask if we have that? So I read it differently. But let's just for a moment say it actually is broader and he somehow could have gotten an exception. It would have been up to the discretion of that district judge. Right. And why don't we read this record as basically saying this judge was not willing to bring a jury in during covid. So whatever he had asked for wasn't going to happen. And so he didn't really have this exception to responses. Number one, I don't read the record that way. I read the record. I think the fairest reading of the record is that the judge simply kept referring to the general prohibition on jury trials. We're not doing it. We're not doing it. We're collectively just not having to. He never and he never addressed the issue of the exception. And he never said and Mr. Grant never asked for an exception because he didn't know about the exception. So, you know, the specific issue of the exception was never addressed. If Mr. Grant had said, I want an exception. Are we supposed to think that the judge didn't know about the exception, even though he's one of a few judges in this district that was probably talking about what the general order should say? I don't know. I don't know how this happened. And it's it's it's unfortunate because the language, the new language every month got bolded and italicized. So it was like, why shouldn't we understand it to be? He did know, but he didn't think this trial was ever going to happen until things opened up better. And so it was just a fact that there were no there was no jury trial in his courtroom. We just don't know because we don't know what that alternate universe would have looked like because Mr. Grant was never informed of the possibility of an exception. So he never asked for an exception. So there was never any ruling on an exception. If there had been a request for an exception and Judge Beisline said, no, not in my courtroom, that would have opened up a different that would have that we'd be in a different universe then, because then Mr. Grant would have made an informed decision about whether to proceed with the bench trial anyway or sit and wait indefinitely for a criminal for a jury trial. Or maybe he would look at Eklund and he would say, oh, wait, maybe I could ask Judge Beisline to, like, refer me to a different judge who's willing to do jury trials because, oh, my gosh, a couple of days after I'm scheduled to. Usually if there's a publicly available rule, we don't assume that the judge misunderstood it. The lawyer misunderstood it. Usually we assume everyone kind of knew what was happening. And so it would have been a fair thing to think that what was happening here was nominally there's this exception, but no jury trial had happened. Eklund happens later. I mean, no one. Why don't we just assume that either no one was having jury trials and no one was making the exception and this judge wasn't going to make the exception. So everything was accurate. Well, I think what we know about Mr. Grant is that if he had been apprised of the exception, he would have asked for it. And so in that universe, that alternate universe. How do we know that? Because I was going to ask you on there's a one of the one of the call quiz he had with the judge on 47. He Mr. Grant says, you know, they're still not doing jury trials. And the judge says, not yet. We're hoping too soon, but not this month, which was accurate. They are talking about trying to open them up. And then Mr. Grant cuts him off and says, you know, no, I was I was going to say, regardless, I'll have a bench trial. So why isn't the most natural inference from there that he was on some level aware of a possibility that they might be wanted a jury trial at some point? But but he just wanted the bench trial because he wanted to go right away. I think when I think of the that one statement, there's two points I have on that. Number one is the weight of the other evidence, which preceded that for months of him saying the only reason, the only reason, the only reason, the only reason I want a bench trial is because I can't get a jury trial. He said it over and over again. The magistrate judge agreed. His defense lawyer agreed. The district judge agreed. It's all over the record that that is the reason why he wanted a bench trial. So that number one, that one loan statement doesn't really outweigh the rest of the evidence chronologically. The other point is chronologically speaking, that colloquy happened after the judge had already granted the request for a bench trial. That was a couple of months after the judge entered a written ruling granting the bench trial in January. That colloquy occurred in March. So by then, the order granting the bench trial had already been entered and it was kind of a matter of history at that point. And so the way I read that record is that by then, Mr. Grant had sort of already – had by like rationalized that like, OK, well, maybe this will be good for me anyway. And so that's what he was basically saying. But it was already a fait accompli. The judge had already entered a written ruling granting him the bench trial based on this massive record over months of everybody agreeing the only reason he wanted it was because he couldn't get a jury trial. But he's been pretty clear the only kind of trial you can get was a bench trial. So I've been asking them since June, well, really since May for a bench trial for my speedy trial. He tells them in December, November, I don't want to wait until January to get a jury trial. I want a bench trial. I want the bench trial now. And he didn't have the bench trial yet as of October 2020 when the exception popped into the general order. And at that point, it was still before the judge had accepted the waiver. And at that point, it was somebody's obligation to inform him so that – because the ultimate question – it's not necessarily even putting the fault on any particular actor in the system. The ultimate question in this area of law is was the waiver knowing and intelligent? And that's all we're asking. So did somebody tell him? And the answer is no. It's kind of like I tell my clients all the time. You should drop a claim for relief. That's a losing claim. Don't waste your time. Don't waste your credibility. Don't waste our word limit. That's a loser. And when you dump a losing claim, you're not dumping anything of value, which is what would have happened for Mr. Grant before the exception crept in. The value of the criminal jury trial had actually faded away substantially because of the pandemic. They weren't existing. It was a right that didn't really exist because it was indefinitely held in abeyance until some point in the future when the pandemic would allow it. But the exception popped into the general orders, and all of a sudden, a little bit of life popped back in to the criminal jury trial. And at that point, the value of the right he was giving up was not communicated to him. But the popping back in depends on the discretion of that judge. And this judge knew that your client had asked for a jury trial, wanted a jury trial, and apparently this judge wasn't willing to give a jury trial. So why don't we assume that that was essentially that if he'd asked, he would have said, look, I don't feel comfortable bringing in a jury. It seems like he was saying there's no jury trial here that you can have because we indulge every presumption against the waiver of constitutional rights. And so whether or not the judge is is is is knowledgeable about the law. That doesn't mean Mr. Grant was and nobody in this record told Mr. Grant that he could ask for an exception. And if the judge had said, no, like, so there are things where you need a knowing waiver. But is there anyone where when there's a discretion of a judge as part of the chain of causation, we assume the judge makes a mistake or something in that and say that that's an automatic violation of the right? No, we would we would assume that the judge would make some ruling in response to the request in response to Mr. Grant would take some action in response to the knowledge. And then he would know, OK, well, I'm I'm waiving a jury trial, right, that I kind of have if I asked for an exception. And then you ask for the exception and the judge could say yes or no. And at that point, then Mr. Grant has full knowledge of his options. He has knowledge of the fact that a jury trial could occur, but the judge said no. So maybe he asked for a new judge. Maybe he just says, oh, heck with it. Let's go ahead with a bench trial. But he didn't know that he could even ask for it. So he didn't know the full contours of the of of the jury trial right that existed at that time. Before October 2020, there was basically no right at all. We need to rule for you on that. Do we need to assume that like if he had asked for another judge, he would have been given one and that judge would have given a jury trial? Like I'm not sure how we get to like he really could have had a jury trial here. And that was what was violated. All we have to ask is whether Mr. Grant fully understood the full contours of the right that he was giving up and that the contours of that right. As of October 2020 and as of the January 2021 order granting him a bench trial included the right to ask for an exception, whereas before it did not. It sounds like you're saying the right isn't the right to a jury trial. It's the right to ask for an exception that he might just be denied. Well, there really was no right to a jury trial. I mean, functionally speaking, there was no right to a jury trial during the pandemic until there was. But he didn't know. He didn't know. It's kind of like another analogy I've been thinking of is like if you go to a surgeon and a surgeon is like, well, there's two ways we can do this. I could use this laser to do your eye. Right. And it's like less invasive. It's safer. There's fewer complications. It's cheaper. It's the preferred thing. I can also do it the old school way with a knife. Problem for you is my laser machine is broken and it's going to be broken indefinitely. I don't know when the laser is going to be available. So you could either have the knife surgery now or you could wait indefinitely for me to fix the laser. And then you go ahead with the knife and then maybe there's a complication. You go back to the surgeon. You say, what's going on with this? And the guy's like, actually, sorry, I was wrong. The laser machine was actually available. I just didn't know. My administrative staff didn't tell me or I had one available from a colleague that I could have barred. I forgot to tell you. I think we're. I was like, you didn't know. It's not informed consent. You didn't know you could ask. You didn't know you could ask for it. Well, I would be upset with the surgeon. I say, why wouldn't you tell me that the laser machine was fixed? Thank you. Thank you. Thank you both sides for the helpful arguments. This case is submitted. Thank you.
judges: BYBEE, FRIEDLAND, MILLER